### UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| TRAVELLERS INTERNATIONAL, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 04 CIV. 176 (GEB) (JJH) |
| | ) | |
| NEXMED, INC. | ) | |
| | ) | |
| Defendant. | ) | |

**OPENING BRIEF OF PLAINTIFF TRAVELLERS INTERNATIONAL, INC.
IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT
ON THE ISSUE OF DEFENDANT'S LIABILITY**

(Argument date - October 18, 2004)

BRAFF, HARRIS & SUKONECK
Brian C. Harris (BH 2964)
Leonard E. Seaman, III (LS 4799)
570 W. Mt. Pleasant Avenue
P.O. Box 657
Livingston, NJ 07039
973-994-6677
Attorneys for Plaintiff Travellers
International, Inc.

OF COUNSEL:

SMITH, KATZENSTEIN & FURLOW LLP
Robert J. Katzenstein (DE Bar No. 378)
Laurence V. Cronin (DE Bar No. 2385)
800 Delaware Avenue, 7th Floor
P.O. Box 410
Wilmington, DE 19899
302-652-8400

Dated: September 15, 2004

RJK6753.WPD

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ii

NATURE AND STAGE OF THE PROCEEDINGS  . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      1.    Background. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      2.    The terms of the Agreement at issue. . . . . . . . . . . . . . . . . . . . . . . . . 3

      3.    The purposes of the Agreement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

      4.    NexMed's alleged termination of the Agreement in April 2003. . . . . . . 8

      5.    NexMed's financing agreement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

      I.    Partial summary judgment on the issue of NexMed's
          liability is appropriate. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

          A.    The standard for summary judgment. . . . . . . . . . . . . . . . . . . . 11

          B.    Contract interpretation under New York law. . . . . . . . . . . . . . . 12

      II.    The Agreement required NexMed to issue warrants to Travellers
          on April 10, 2003. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

          A.    NexMed's notice of termination was not timely. . . . . . . . . . . . 13

              1.    The Agreement requires ten days' notice to terminate. . . 13

              2.    NexMed could not validly give notice of termination
                    after April 10, 2003 that would negate the contractual
                    duty to issue and deliver warrants on April 10, 2003. . . . 14

      III.    The Court Need Not Address the Issue of a Remedy at this Time. . . . . 16

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

# TABLE OF AUTHORITIES

**Cases**                                                                                    **Page(s)**

*Celotex Corp. v. Catrett,*
    477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) . . . . . . . . . . . . . . . . . . . . 11

*Cruden v. Bank of New York,*
    957 F.2d 961 (2nd Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13

*First National Bank of Chicago v. Ackerley Communications, Inc.,*
    No. 94 Civ. 7539 (KTD), 2001 WL 15693 (S.D.N.Y. Jan. 8, 2001),
    *aff'd,* 28 Fed. Appx. 61 (2nd Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15

*Hatt v. Burlington Coat Factory,*
    819 A.2d 260 (Conn. 2003 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*In re Hotel Syracuse, Inc.,*
    154 B.R. 13 (N.D.N.Y. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*McIntosh v. Antonino,*
    71 F.3d 29 (1st Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Murphy Bros., Inc., v. Michetti Pipe Stringing, Inc.,*
    526 U.S. 344, 119 S.Ct. 1322 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16

*Phillips, Inc. v. Historic Properties of America, LLC,*
    581 S.E.2d 389 (Ga. Ct. App. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Universal Nutrition Corp. v. Carbolite Foods, Inc.,*
    325 F.Supp.2d 526 (D.N.J. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12

**Statutes and Other Authorities**                                                      **Page(s)**

28 U.S.C. § 1446 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Fed.R.Civ.P. 56 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

**NATURE AND STAGE OF THE PROCEEDINGS**

The complaint in this case was filed in the New Jersey Superior Court on December 23, 2003.  The plaintiff, Travellers International, Inc. ("Travellers") alleges that NexMed, Inc. ("NexMed"), the defendant, breached a consulting agreement.

NexMed removed the case to this Court.  The parties have conducted written discovery and depositions.

Travellers has filed a motion for partial summary judgment on the issue of liability. This is Travellers' opening brief in support of that motion.

## STATEMENT OF FACTS

There are many factual disputes between the parties.  However, none is relevant to Travellers' motion for partial summary judgment on the issue of liability.

### 1.    Background.

NexMed is a pharmaceutical company that is developing a drug, Alprox TD, for the treatment of erectile dysfunction.[1]  In November 2002, NexMed received a notice from the United States Food and Drug Administration ("FDA") that it was placing a hold on clinical trials of Alprox TD because of concerns about a toxicology study.[2]  On November 13, 2002, NexMed issued a press release[3] announcing the FDA's action. That announcement had a significant effect on NexMed's stock price, causing it to fall from a closing price of $1.37 on November 13, 2002 to 57 cents at the close on November 14, 2002[4], a decrease of 58% in one day.

NexMed and Travellers entered into a Consulting Agreement ("the Agreement") on which the signatures are dated January 27, 2003.[5]  A copy of the Agreement is Exhibit D to

---

[1]Deposition of Joseph Mo ("Mo deposition") at p. 21.  Pages of Dr. Mo's deposition referred to herein appear as Exhibit A to the Certification of Robert J. Katzenstein ("Katzenstein Certification"), filed herewith.

[2]*Id.* at 20-21.

[3]A copy of the press release, from NexMed's Web site, is Exhibit B to the Katzenstein Certification.

[4]Yahoo! Finance compilation of stock prices, Exhibit C to the Katzenstein Certification.

[5]The Agreement begins: "THIS AGREEMENT made the 10th day of January 31, 2003."  The parties signing the Agreement each entered the date January 27, 2003.  The precise date is not relevant to the pending motion.

the Katzenstein Certification.  The Agreement was signed by Joseph Mo, Ph.D. ("Mo"),

President and CEO of NexMed, and by Marc M. Hazout ("Hazout"), Managing Director of

Travellers.

  **2.**  **The terms of the Agreement at issue.**

  There are three contract provisions relevant to Travellers' motion for partial summary

judgment.

  Section 1.2 of the Agreement states:

  **1.2**  **TERM**

   The Company [NexMed] hereby engages the Consultant [Travellers] for a
term commencing on January 31, 2003 and ending on December 31, 2003 (the
"Term") provided that, and notwithstanding the foregoing, upon the expiry of the
original term, unless otherwise terminated as described herein, this agreement shall
be renewed upon the negotiation and agreement on its new terms and conditions.
Notwithstanding the foregoing, the Company [NexMed] shall be entitled to terminate
this Agreement at its discretion at any time by providing ten- (10) days' written
notice to the Consultant [Travellers].

  The Agreement provided that NexMed would compensate Travellers for its services

in various ways including, in Section 2.1.c. of the Agreement, the issuance of warrants.  This

provision is the basis for Travellers' claim in this case.  Section 2.1.c. states, in relevant part:

  c.  Options

   The Company [NexMed] shall issue to Consultants [Travellers] or their
respective assignees:

   i)  Warrants to purchase Common Stock in Company (the "Warrants"):

    1)  The number of Warrants available to Consultants ("Warrants
Available") shall be 500,000, which allows Consultant to
purchase up to 500,000 shares of the Company's common
stock, and which is to be issued and delivered to Consultants
on April 10, 2003, pending satisfactory performance of
Consultant as judged by the Company at its discretion.

ii)     The Warrant Exercise price (the "Exercise Price") shall be:

1)     $1.00 for up to 100% of the Warrants Available, and,
2)     Consultant may exercise Warrants Available via the payment
       of cash any time for a period of 18 months.

Finally, the notice provision appears as Section 5.1 of the Agreement:

5.1     **Notice.**          Any notice required, permitted or desired to be given pursuant
        to any of the provisions of this Agreement shall be deemed to have been
        sufficiently given or served for all purposes if delivered in person or sent by
        certified mail, return receipt requested, postage and fees prepaid, or by
        national overnight delivery prepaid services to the parties at their addresses
        set forth below. . . .

Section 5.2 of the Agreement states that it "shall be governed, interpreted and

construed in accordance with the laws of the State of New York."

**3.      The purposes of the Agreement.**

Section 1.1 of the Agreement provides that "[NexMed] hereby engages [Travellers]

to provide investor relations and financial consulting services to [NexMed] as described in

Schedule "A" hereof."  There is no Schedule A to the Agreement.   Section 2.1 of the

Agreement states that NexMed shall pay to NexMed (a) a percentage of funding the

Travellers obtains for NexMed; (b) $125,000 upon execution of the Agreement; (c) $30,000

monthly beginning in April 2003; and (d) expenses.  In addition, Section 2.1.c, quoted *supra*,

required NexMed to issue options to Travellers on April 10, 2003.  Section 2.1 (d) of the

Agreement required NexMed to pay to Travellers certain percentages of the consideration

paid for any acquisition or sale by NexMed of any business, corporation or division, and for

any private or public placement of debt or equity securities of NexMed.

While the parties may disagree as to the primary purpose of the Agreement, the Court need not reach that question in the course of deciding this motion.  However, a discussion of the parties' positions concerning the purpose of the Agreement may be helpful.

Travellers asserts that the primary purpose of the Agreement was to get NexMed's stock above $1.00.  It is undisputed that NexMed had received a letter dated December 31, 2002 from NASDAQ[6], stating, in relevant part:

> Dear Dr. Mo:
>
> For the last 30 consecutive trading days, the price of the Company's common stock has closed below the minimum $1.00 per share requirement for continued inclusion under Marketplace Rule 4450(a)(5) (the "Rule").  Therefore, in accordance with Marketplace Rule 4450(e)(2), the Company will be provided 90 calendar days, or until March 31, 2003, to regain compliance.  If, at anytime [sic] before March 31, 2003, the bid price of the Company's common stock closes at $1.00 per share or more for a *minimum* of 10 consecutive trading days, Staff will provide written notification that the Company complies with the Rule.  If compliance with this Rule cannot be demonstrated by March 31, 2003, Staff will provide written notification that the Company's securities will be delisted.  At that time, the Company may appeal Staff's determination to a Listing Qualifications Panel.

NASDAQ sent NexMed a letter dated February 11, 2003,[7] stating, in relevant part:

> Dear Dr. Mo:
>
> On December 31, 2002, Staff notified the Company that its common stock failed to maintain a minimum bid price of $1.00 over the previous 30 consecutive trading days as required by The Nasdaq National Market set forth in Marketplace Rule 4450(a)(5) (the "Rule").  Since then, the closing bid price of the Company's common stock has been at $1.00 per share or greater for at least 10 consecutive trading days.  Accordingly, the Company has regained compliance with the Rule and this matter is now closed.

---

[6]Exhibit E to the Katzenstein Certification [footnotes omitted].

[7]Exhibit F to the Katzenstein Certification.

That letter was terrific news for NexMed and Dr. Mo was jubilant.[8]

NexMed asserts that Travellers was retained to raise money.  However, Dr. Mo acknowledged that increasing the price of the stock over $1.00 "would be fine":

> Q:     The increase of the price of NexMed stock over a dollar was not a goal of your consulting agreement with Travellers?
>
> A:     Not the primary goal, you know, it's a, since we have retained Travellers International to raise money, you know, we thought, well, if they could, also, just help us doing a little bit IR situation or PR situation, that would be fine.[9]

The importance of raising and maintaining the stock price is demonstrated by the minutes[10] of a meeting on Saturday, January 25, 2003 of the Finance Committee of NexMed's Board of Directors, which state, in relevant part:

### MINUTES OF A MEETING
### OF THE FINANCE COMMITTEE (THE "COMMITTEE")
### OF THE BOARD OF DIRECTORS OF NEXMED, INC. (THE "COMPANY")

A Committee meeting was called to order at 11:30 a.m., on Saturday, January 25, 2003 via teleconference.  Richard Berman chaired the meeting that was also attended by Joseph Mo and Steve Sammut.

> 1.     Financing of the Company for the next 3 months:
> Dr. Mo updated the Committee that a short-term loan of $500,000 was acquired because of urgent cash needs to maintain operations.  As the Company needs an additional $4 million in order to maintain operations for the next 3 months and another $4 million for the rest of the year, Dr. Mo and Vivian Liu are actively exploring various possibilities for bringing additional cash infusion via equity and/or debt placements.  The Committee agreed that the Company must raise $8 to $10 million.  The Committee also acknowledged

---

[8]Mo deposition (Exhibit A to the Katzenstein Certification) at 62.

[9]*Id.* at 63-64.

[10]Exhibit G to the Katzenstein Certification.

the urgency and need for the Company to close a placement, which might take place prior to the FDA announcement.

2.    Proposed Agreement from Travellers International, Inc. ("Travellers"):

Mr. Berman recommended the service of Travellers which is a Canadian-based firm, to provide investor relations and financial consulting services for the Company. Dr. Mo met with Travellers and its associates. As the result of the meeting in Toronto, Travellers presented a proposed agreement that included a front payment of $125,000, a retainer payment of $30,000 per month for 9 months in 2003, and 500,000 12-month warrants which are performance-based at an exercise price of $1.00/share. (The Company's share closed at $0.88/share on January 21, 2003 when Dr. Mo met with Travellers.) The Company has the option at its total discretion, to terminate this proposed agreement at any time during the term of the agreement. Dr. Mo was asked to negotiate the final terms and conditions of the agreement which will be reviewed by Mr. Berman and approved by the Committee for final approval by the Board of Directors.

There being no further matters to discuss, the meeting adjourned.

It is significant that in the minutes quoted immediately *supra,* the issue of raising capital was discussed separately from the approval of the agreement with Travellers, and the warrants at issue in this case are described as "*performance-based* at an exercise price of $1.00/share" (emphasis added). In addition, the minutes note that "[t]he Company's share closed at $0.88/share on January 21, 2003 when Dr. Mo met with Travellers."

RJK6753.WPD

7

4.      **NexMed's alleged termination of the Agreement in April 2003.**

NexMed claims that on April 9, 2003, Mo sent, by facsimile only, an unsigned letter

to Hazout of Travellers[11], which letter stated:

> Dear Mr. Hazout:
>
> Pursuant to the Consulting Agreement (the "Agreement") dated January 31,
> 2003, between NexMed, Inc. (the "Company") and Travellers International
> Inc. (the "Consultant"), we hereby advise you of our decision to terminate the
> Agreement, effective immediately.   Based on our assessment of the
> Consultant's performance to date, we have elected not to issue the Warrants
> referenced in Article II, Paragraph 2-1 (c) of the Agreement.
>
> Sincerely yours,
>
>
> Y. Joseph Mo
> President & CEO
>
> IN WITNESS WHEREOF, that on this day of April ___, 2003, before me Y.
> Joseph Mo personally appeared and signed this letter with his signature.  This
> letter is executed in duplicates.
>
> WITNESS

Travellers denies that it received the letter on April 9.[12]

The next day, April 10, 2003, Dr. Mo signed the original of the letter and had it

notarized.[13]  NexMed claims that it sent the letter by facsimile to Travellers on April 10,

2003.  Travellers denies that it received the letter on April 10.[14]   The next day, April 11,

2003, the original notarized letter was taken by NexMed to the local Post Office and sent to

---

[11]Exhibit H to the Katzenstein Certification.

[12]Katzenstein Certification, Exhibit I, Hazout Deposition at 146.

[13]Katzenstein Certification, Exhibit J.

[14]Katzenstein Certification, Exhibit I, Hazout Deposition at 148.

Travellers by Registered Mail. The date stamp on the Receipt for Registered Mail[15] indicates that the letter was received by the Post Office on April 11, 2003. The Return Receipt for International Mail[16] indicates that the letter reached the Canadian post office on April 22, 2003.

Internal NexMed e-mails indicate that NexMed was aware that the Agreement required the warrants to be issued on April 10, 2003. An e-mail[17] dated April 10, 2003 to Vivian Liu, a NexMed vice president, from Mark Westgate, NexMed's comptroller, states, in relevant part:

> On another subject. The Travellers warrants are supposed to be issued today. Where do we stand on that? Also the first monthly payment was due on April 1st. Have they asked for the payment or the warrants for that matter.

Ms. Liu replied in an e-mail[18] to Mr. Westgate less than 20 minutes later: "Dr. Mo terminated their services effective 4/9/03 and doesn't plan to issue the warrants."

**5.      NexMed's financing agreement.**

On April 22, 2003, NexMed issued a press release[19] announcing that it had closed a private placement for $8 million. A week before that, on April 15, 2003, Mr. Westgate sent

---

[15]*Id.* at NEXM 0052.

[16]*Id.* at NEXM 0055.

[17]Katzenstein Certification, Exhibit K.

[18]*Id.*

[19]Katzenstein Certification, Exhibit L.

an e-mail[20] to Ms. Liu enclosing a document entitled "Schedules for Purchase Agreement."

The e-mail states:

> Attached is the schedule witht he [sic] blank filled in.  Outstanding warrants 2,252,398.  This does not include the 500,000 to Travellers which were never issued which, by the way, I need the doc. cancelling that agreement before PWC is here.  That's the only blank that needed to be filled.  Right?

NexMed's outside auditor at the time was Pricewaterhouse Coopers,[21] sometimes referred

as "PWC."

Ms. Liu gave two replies on the same date.  At 4:40 p.m, she wrote[22]:

> Cool.  The other is the date.  I took out the Travellers discussion in this since they were never issued.

At 4:57 p.m., she wrote[23]:

> Last I heard, Dr. Mo issued a termination notice.  Subsequently, they talked about pushing it out to 5/31 but the other party hasn't confirmed it.  So I'm not sure what's the status.

> Right now I told Dr. Mo that I don't want to rock the boat by forcing the issue with the guys.  After we close will be a different story.

---

[20]Katzenstein Certification, Exhibits M and N.

[21]Mo deposition (Katzenstein Exhibit A) at p. 99.

[22]*Id.*

[23]Katzenstein Certification, Exhibit N.

## ARGUMENT

**I.**   **Partial summary judgment on the issue of NexMed's liability is appropriate.**

   **A.**   **The standard for summary judgment.**

   A party seeking summary judgment must "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Orson, Inc. v. Miramax Film Corp.,* 79 F.3d 1358, 1366 (3d Cir.1996); *Healy v. New York Life Ins. Co.,* 860 F.2d 1209, 1219, n. 3 (3d Cir.1988), *cert. denied,* 490 U.S. 1098, 109 S.Ct. 2449, 104 L.Ed.2d 1004 (1989); *Hersh v. Allen Prod. Co.,* 789 F.2d 230, 232 (3d Cir.1986). The threshold inquiry is whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (noting that no issue for trial exists unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict in its favor). In deciding whether triable issues of fact exist, the Court must view the underlying facts and draw all reasonable inferences in favor of the non-moving party. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Pennsylvania Coal Ass'n v. Babbitt,* 63 F.3d 231, 236 (3d Cir.1995); *Hancock Indus. v. Schaeffer,* 811 F.2d 225, 231 (3d Cir.1987).

*Universal Nutrition Corp. v. Carbolite Foods, Inc.,* 325 F.Supp.2d 526, 529 (D.N.J. 2004).

   Under Fed.R.Civ.P. 56, a movant must be awarded summary judgment on all properly supported issues identified in its motion, except those for which the non-moving party has provided evidence to show that a question of material fact remains. *See Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553.

   Put another way, once the moving party has properly supported its showing of no triable issue of fact and of an entitlement to judgment as a matter of law, for example, with affidavits, which may be "supplemented ... by depositions, answers to interrogatories, or further affidavits," *id.,* "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586 n. 12, 106 S.Ct. 1348; *see also Anderson,* 477 U.S. at 247-48, 106 S.Ct. 2505 ("[B]y its very terms, this standard provides that the mere existence of some alleged factual

dispute between the parties will not defeat an otherwise properly supported motion ... the requirement is that there be no *genuine* issue of *material* fact.") (emphasis in original).

Under the rule, a movant must be awarded summary judgment on all properly supported issues identified in its motion, except those for which the non-moving party has provided evidence to show that a question of material fact remains. *See Celotex,* 477 U.S. at 324, 106 S.Ct. 2548. Put another way, once the moving party has properly supported its showing of no triable issue of fact and of an entitlement to judgment as a matter of law, for example, with affidavits, which may be "supplemented ... by depositions, answers to interrogatories, or further affidavits," *id.,* "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586 n. 12, 106 S.Ct. 1348; *see also Anderson,* 477 U.S. at 247-48, 106 S.Ct. 2505 ("[B]y its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion ... the requirement is that there be no *genuine* issue of *material* fact.") (emphasis in original).

What the non-moving party must do is "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' " *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548; *see also Lujan v. National Wildlife Fed.,* 497 U.S. 871, 888, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990) ("The object of [Rule 56(e)] is not to replace conclusory allegations of the complaint ... with conclusory allegations of an affidavit."); *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505; *Big Apple BMW, Inc. v. BMW of N. Am., Inc.,* 974 F.2d 1358, 1363 (3d Cir.1992) ("To raise a genuine issue of material fact ... the [nonmoving party] need not match, item for item, each piece of evidence proffered by the movant" but rather must exceed the "mere scintilla" threshold.), *cert. denied,* 507 U.S. 912, 113 S.Ct. 1262, 122 L.Ed.2d 659 (1993).

*Universal Nutrition Corp.*, 325 F.Supp.2d at 530.

## B.   Contract interpretation under New York law.

Under New York law, a written contract is to be interpreted so as to give effect to the intention of the parties as expressed in the unequivocal language they have employed. . . Construing an unambiguous contract provision is a function of the court, rather than a jury, and matters extrinsic to the agreement may not be considered when the intent of the parties can fairly be gleaned from the fact of the instrument. . . A court may neither rewrite, under the guise of interpretation, a term of the contract when the

term is clear and unambiguous, . . . nor redraft a contract to accord with its
instinct for the dispensation of equity upon the facts of a given case.

*Cruden v. Bank of New York*, 957 F.2d 961, 976 (2nd Cir. 1992) (citations omitted).

## II.     The Agreement required NexMed to issue warrants to Travellers on April 10, 2003.

Unless NexMed terminated the Agreement on or before April 10, 2003, Section 2.1.c
of the Agreement required NexMed to issue and deliver to Travellers on April 10, 2003
warrants for the purchase of up to 500,000 shares of NexMed common stock.  NexMed
claims that it validly terminated the Agreement prior to April 10, 2003.  Travellers claims
that it did not.  That is the issue presented by this motion.

### A.     NexMed's notice of termination was not timely.

Giving NexMed the benefit of all disputes of material facts, there is no dispute that
the only notice of termination of the Agreement that NexMed sent to Travellers on or before
April 10, 2003 was the letter allegedly sent by facsimile on April 9 and 10, 2003.

#### 1.     The Agreement requires ten days' notice to terminate.

Under Section 1.2 of the Agreement, NexMed was required to give Travellers ten
days' written notice in order to terminate the Agreement.  Therefore, the letter dated April
9, 2003, even it had been properly delivered to Travellers on that date by a method specified
in the Agreement, would not have been effective until April 19, 2003.  Therefore, it could
not have excused NexMed's contractual obligation under Section 2.1.c. to "issue and
deliver" warrants to Travellers on April 10, 2003.

    **2.**    **NexMed could not validly give notice of termination after April 10, 2003 that would negate the contractual duty to issue and <u>deliver warrants on April 10, 2003.</u>**

In the alternative, even if the Court were to decide not to apply the ten-day notice requirement of contract termination to NexMed's obligation to issue warrants under Section 2.1.c of the Agreement, the cases discussed herein establish that NexMed's notice of termination, and its decision not to issue the warrants, was not delivered to Travellers before NexMed's obligation to issue and deliver the warrants matured on April 10, 2003. Therefore, NexMed wrongfully breached its obligation to issue and deliver such warrants on that date.

The notice provision of the Agreement, Section 5.1, quoted at page 4, *supra*, is explicit: it requires that a notice under the Agreement be "delivered in person or sent by certified mail, return receipt requested, postage and fees prepaid, or by overnight delivery prepaid services. . . ."  There is no mention of facsimile transmission as a permitted method of notice.  The notice was sent by Registered Mail on April 11, 2003, one day after NexMed was required by Section 2.1.c of the Agreement to issue and deliver warrants to Travellers.

In *First National Bank of Chicago v. Ackerley Communications, Inc.*, No. 94 Civ. 7539 (KTD), 2001 WL 15693 (S.D.N.Y. Jan. 8, 2001) (Exhibit 1 hereto), *aff'd*, 28 Fed. Appx. 61 (2nd Cir. 2002), the court considered proper notice under the following notice provision that is very similar to the notice provision in this case, quoted at p. 4, *supra*:

> Any notice or communication in respect of this Agreement will be sufficiently given to a party if in writing and delivered in person, sent by certified or registered mail (airmail, if overseas) or the equivalent (with return receipt requested) or by overnight courier or given by telex (with answerback received) at the address or telex number specified.

*Id.* at *4.   The contract required First National Bank to give notice to Ackerley Communications of its intent to exercise an option in order to extend the term of the contract by two years.   The bank sent the notice by facsimile.   The court, applying New York law, rejected the bank's argument that notice by facsimile satisfied the quoted notice provision:

> There is absolutely no proof that First Chicago attempted notification of Ackerley by any of the means listed in the contract.   Failure to give the required notice defeats First Chicago's entire claim.   *See Kaplan v. Lippman*, 75 N.Y.2d 320, 324-25, 552 N.E.2d 151, 552 N.Y.S.2d 903 (1990) (stating that the optionee must exercise the option in accordance with its terms and in the manner specified in the option).   It is hornbook law that when the terms of a written contract are clear and unambiguous and those terms require written notification in a particular manner then such notification can be given only in that manner.   *See* 22 N.Y. Jur Contracts § 214; *see also* Farnsworth on Contracts § 3.23a (1998) ("Because an option is a contract...the time for exercise of the option is subject to the rules on conditions, including the rules relating to waiver of conditions."); *Cruden v. Bank of New York*, 957 F.2d 961, 976 (2d Cir. 1992) ("Under New York law, a written contract is to be interpreted so as to give effect to the intention of the parties as expressed in the unequivocal language they have employed.").

*Id.*

Other courts have also held that facsimile communications do not constitute notice under notice provisions that do not specifically include such communications among permitted methods of notice.   *Phillips, Inc. v. Historic Properties of America, LLC*, 581 S.E.2d 389 (Ga. Ct. App. 2003) (notice of lien sent via facsimile transmission not valid under  statute that required sending copy of claim of lien by registered or certified mail or statutory overnight delivery); *Hatt v. Burlington Coat Factory*, 819 A.2d 260, 294-95 (Conn. 2003) (facsimile from workers' compensation commission was not proper notice of a commissioner's decision when statute required service by notice served personally or by registered or certified mail).   *See Murphy Bros., Inc., v. Michetti Pipe Stringing, Inc.*, 526

U.S. 344, 119 S.Ct. 1322 (1999) (receipt of complaint by facsimile did not constitute receipt "through service or otherwise" under the removal statute, 28 U.S.C. § 1446(b)); *McIntosh v. Antonino*, 71 F.3d 29, 34 (1st Cir. 1995) ("Absent a local rule authorizing the practice, facsimile filings in a federal court are dead on arrival."); *In re Hotel Syracuse, Inc.*, 154 B.R. 13, 17 (N.D.N.Y. 1993) ("Because neither the Bankruptcy Rules nor any other controlling statutes, rules or case law provide otherwise, the City's attempt to rely on facsimile filing must fail.")

NexMed did not give timely notice to Travellers on or before April 10, 2003 that (a) it was terminating the Agreement or (b) that NexMed viewed Travellers' performance of the contract not to be satisfactory. Therefore, Section 2.1.c of the Agreement required that NexMed issue and deliver to Travellers the 500,000 warrants described in that section.

**III.   The Court Need Not Address the Issue of a Remedy at this Time.**

Since NexMed failed to issue and deliver to Travellers on April 10, 2003 the warrants described in Section 2.1.c of the Agreement, Travellers was denied the opportunity to exercise those warrants before the price of NexMed stock fell. Travellers will in the near future move to amend the Complaint to allege Travellers' right to damages as an alternative remedy in the present prayer for relief of the issuance of warrants. That is a question of damages that Travellers does not ask the Court to address at this time. The Court need not address in order to decide this motion for partial summary judgment on the issue of liability.

## CONCLUSION

For the reasons stated herein, plaintiff Travellers submits that the Court should grant it

partial summary judgment on the issue of liability, with the issue of plaintiff's remedy to be

decided at a later time.

BRAFF, HARRIS & SUKONECK

Brian C. Harris (BH 2964)
Leonard E. Seaman, III (LS 4799)
570 W. Mt. Pleasant Avenue
P.O. Box 657
Livingston, NJ 07039
973-994-6677
Attorneys for Plaintiff Travellers
International, Inc.

OF COUNSEL:

SMITH, KATZENSTEIN & FURLOW LLP
Robert J. Katzenstein (DE Bar No. 378)
Laurence V. Cronin (DE Bar No. 2385)
800 Delaware Avenue, 7th Floor
P.O. Box 410
Wilmington, DE 19899
302-652-8400


Dated: September 15, 2004

# EXHIBIT 1



Not Reported in F.Supp.2d
2001 WL 15693 (S.D.N.Y.)
**(Cite as: 2001 WL 15693 (S.D.N.Y.))**

Page 1

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.

THE FIRST NATIONAL BANK OF CHICAGO,
Plaintiff,
v.
ACKERLEY COMMUNICATIONS, INC.,
Defendant.

**No. 94 Civ. 7539(KTD).**

Jan. 8, 2001.

Richard I. Janvey, Nicholas R. Weiskopf, Janvey, Gordon, Herlands, Randolph, Rosenberg & Cox LLP, New York, New York, John C. Simons, the First National Bank of Chicago, Chicago, Illinois, for Plaintiff.

Jeffrey Harris, Rubin, Winston, Diercks, Harris & Cooke, LLP, Washington, DC, for Defendant.

*OPINION*

DUFFY, J.

**\*1** This lawsuit, brought by Plaintiff First National Bank of Chicago ("First Chicago") against Defendant Ackerley Communications, Inc. ("Ackerley") centers around an interest rate swap with a two year option to extend. First Chicago alleged that Ackerley breached this contract by refusing to accept timely notice of the bank's election to extend the agreement and subsequently failing to make payments called for under the agreement. Ackerley maintains, however, that it did not receive effective notice of the decision to exercise the option. The parties stipulated to certain facts in a joint pre-trial order. I heard testimony and received evidence at a two day bench trial of this matter on

December 5-6, 2000. The following constitute my findings of fact and conclusions of law.

An understanding of this transaction and the arguments raised by the parties depends first upon an understanding of the underlying interest rate swap arrangement. First Chicago attempted to explain the arrangement through the testimony of John Anderson ("Anderson"), an interest rate derivatives trader:

Assume that [a corporation rated] AAA can borrow at a fixed rate of interest of 8.50 or they can borrow at a floating rate of LIBOR plus .25.... [A corporation rated CCC] can borrow at 9.50 on a fixed rate of interest or LIBOR plus 1 percent.

In both cases CCC has to pay more money to borrow money than AAA.... [T]hey would have to pay floating plus 1 percent or 9.50, AAA could pay Floating plus .25 percent or 8.50. But AAA has a comparative advantage if they always borrow fixed at 8.50 and ... CCC borrows money at LIBOR plus 1 percent.

Imagine that CCC, or Ackerley in this case, ... doesn't want to borrow floating, because they want to know what their interest rate payments are going to be in the future. They want to lock in that cost. So they would rather be fixed. Then they come to a bank, and this is where the bank sits in the middle, and they do a swap to change this from a floating rate of interest to a fixed rate of interest. So the bank will pay them this LIBOR plus 1 percent, and then CCC will pay the bank a floating rate of interest, and we can make it 9.40....

AAA then has to decide that they have enough fixed rate debt, they would rather have floating rate debt, but they issue fixed anyway, because they can then go to the bank and the bank will pay them 8.50 and they pay the bank LIBOR plus .15.

Now, this fixed rate of interest 8.50 and this fixed rate of interest cancel each other out, so the payments are exactly identical, so there is no net payment there. The bank pays it to AAA, who passes it through to their investors. They still have this money, so they have to pay the bank some interest rate, and they pay LIBOR plus .15.

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2001 WL 15693 (S.D.N.Y.)
**(Cite as: 2001 WL 15693 (S.D.N.Y.))**

The exact opposite with CCC. We pay them LIBOR plus 1.00, they pay LIBOR plus 1.00 to the investors. That nets out to zero, as does this. But they are left paying us a fixed rate of interest of 9.40.... The bank is paying 8.50 to AAA, it is receiving 9.40 ·from CCC, so the bank is making .9 percent.

**\*2** ....

... And on the floating the bank is paying LIBOR plus 1.00 and it is receiving LIBOR plus .15. So it is net paying out 85 basis points. The bank keeps this 5 basis point spread by finding these two counterparties, putting them together, and then taking the ongoing administrative risk and credit risk of having these two swaps on.

(Tr. at 121-23.) It is upon this purely theoretical model that First Chicago bases its case and particularly its assertion and computation of damages. This explanation might work well in a purely theoretical forum, but it ignores reality.

Here, First Chicago never tried to act as intermediary between two customers. First Chicago undertook to sell either half of the theoretical swap to a customer with the bank taking the entire risk of the other side. First Chicago could not and did not point to any countervailing swaps to the one in question since, in fact, there were none. The bank had assumed all the risk and, of course, in assuming all the risk ·the bank took all the profit.

One might ask what is the economic motive for a borrower to get involved in this arrangement. Essentially, the borrower is looking for insurance against wild swings in the going interest rates and the ability to forecast its interest payments. In view of the fact, then, that there is no real swap, one might analogize this to the bank issuing an insurance policy and receiving a variable premium.

It is true that a good options portfolio manager would insist upon swap options on both sides of the theoretical model; and depending upon the direction of the market rate, would favor one or the other. It is clear, however, that in this case the bank took all of the profits and all of the risk.

Good financial management merely demanded that the bank "hedge" its "over-all" risk with a macro-hedge such as suggested by Anderson. (Tr. at 139.) This macro-hedge, however, was a hedge against all of the bank's liabilities and was not restricted to the swap arrangement entered into with Ackerley. To suggest that the bank lost money into its macro-hedge because of the Ackerley transaction is to engage in speculation which approaches pure fantasy.

Facts

On June 20, 1989 First Chicago and Ackerley entered into the interest rate swap agreement (the "Swap Agreement"). Under the terms of this agreement, First Chicago had the unilateral right to extend the Swap Agreement for a two year period beyond the termination date of June 22, 1994 (the "Option"). [FN1] In order to exercise the Option, First Chicago needed to notify Ackerley on or before June 20, 1994 of its election to change the termination date. The crucial issue at trial was whether First Chicago effectively notified Ackerley of its decision to exercise this option. The Swap Agreement by its terms is governed by New York law and this Court has diversity jurisdiction under 28 U.S.C. § 1332.

> FN1. Plaintiff's witness insisted on classifying the Swap Agreement as a seven year agreement with an option to terminate at the end of the fifth year, proposing that this distinction makes little difference. I disagree. The actual language of the Swap Agreement, which describes the Option as an option to extend, dictates an interpretation of the Swap Agreement as a five year contract with a unilateral right to extend for an additional two years. This reading demands that the Agreement automatically terminate at the end of year five, regardless of prevailing rates.

Prior to the Swap Agreement, First Chicago arranged a syndicated loan for Ackerley. This loan had a floating interest rate. (Tr. at 68.) Thereafter, in 1989, Kenneth

Not Reported in F.Supp.2d
2001 WL 15693 (S.D.N.Y.)
**(Cite as: 2001 WL 15693 (S.D.N.Y.))**

Page 3

Selle ("Selle"), an officer in First Chicago's Loan Sales Syndication Department, put Ackerley executives in contact with the First Chicago Global Derivatives Group. Analysts in the Global Derivatives Group then sold the Swap Agreement to Ackerley, as a means of decreasing risk stemming from the fluctuation of interest rates connected to Ackerley's floating rate obligations. (Tr. at 87.)

*3 Under the terms of the Swap Agreement (dictated solely by First Chicago), Ackerley was to pay First Chicago a fixed 8.8 percent interest on a $15 million notional amount. (Pl.'s Ex. 2.) At the time the Swap Agreement was signed, the floating rate was calculated at 9.4375 percent. The difference between these two rates meant that First Chicago paid .6375 percent interest on the Notional Amount, or $95,625.00, to Ackerley on the first payment date following execution of the Swap Agreement. Over the five year term of the Swap Agreement, however, interest rates dropped, such that Ackerley made more payments to First Chicago than First Chicago made to Ackerley. (Tr. at 81.)

As mentioned above, the Option provided by the Swap Agreement granted First Chicago the unilateral right to extend the swap for an additional two years under the same terms as were in force during the initial five years. Interest rate swaps with this kind of option have come to be known as "swaptions." (Tr. at 80.) In this case, the Option expired on June 20, 1994. Notice of First Chicago's intent to exercise the Option had to be given to Ackerley by the end of business on that day in order to extend the Swap Agreement from June 22, 1994 to June 22, 1996.

Jonathan Lance ("Lance"), a vice-president in First Chicago's Global Derivatives Group at the time in question, asserted that he attempted to reach Denis Curley ("Curley"), Chief Financial Officer of Ackerley, by phone on the afternoon of June 20. (Tr. at 15.) Unable to find Curley or "someone else who was backing him up," [FN2] Lance prepared a facsimile cover sheet and one page letter notifying Ackerley of the bank's decision to exercise the Option. (Tr. at 16.) Lance instructed Patrick Hennelly ("Hennelly"), a marketing analyst in the Global Derivatives Group, to

fax this notice to Ackerley. (Tr. at 18.) Hennelly testified to placing the two sheets on the fax machine, dialing the fax number, and pressing "Enter, Go, Send, whatever the button was relevant on that machine." (Tr. at 54.) Hennelly returned some time later and retrieved the original document from the output tray of the fax machine. (Tr. at 55.)

> FN2. While I have no reason to doubt that Lance attempted to reach Curley by phone, there is no evidence that he asked to leave a message for Curley, despite the alleged importance of this transaction to First Chicago.

On June 20, 1994 Curley and Keith Ritzmann ("Ritzmann"), Controller for Ackerley, discussed whether either of them "had received anything from First Chicago indicating their intent to exercise that option." (Tr. at 98.) Ritzmann then asked Curley's assistant, Mary Robertson ("Robertson") if any correspondence from First Chicago had arrived. (Tr. at 98.) Robertson asked the secretaries in the office whether "anything" had arrived from First Chicago. (Tr. at 107.) To the best of her knowledge, nothing had been delivered from First Chicago at that time.

Two days later Lance received a phone call from Selle regarding First Chicago's failure to exercise the Option. (Tr. at 19.) There are two versions of this phone call. According to Lance's testimony, this was the first he heard of any problem with the notice he had prepared on June 20. (Tr. at 18.) Lance recounted that he was called by Selle because Selle received a call from Curley "who had not received the fax outlining First Chicago's right to extend the swap for two more years." (Tr. at 19.) At the instruction of Laurie Walsh, the head of documentation for the Global Derivatives Group, Lance then refaxed the letter to Curley. (Tr. at 20.)

*4 Selle, however, painted a different picture of June 22, 1994. According to Selle, Curley called him on June 22 specifically because Ackerley "had received a fax from the derivatives department on that day

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2001 WL 15693 (S.D.N.Y.)
**(Cite as: 2001 WL 15693 (S.D.N.Y.))**

Page 4

notifying [Ackerley] of extension of the option." (Tr. at 70.) As this notice was untimely, Curley called Selle to inform him that it was too late to exercise the Option. Tr. at 70.) Selle then called Lance to inquire why notice was sent on June 22. (Tr. at 70.) Lance informed him "that [First Chicago] had extended another fax out to the company regarding the extension." (Tr. at 70.) I find Selle's version of the conversation to be the more credible statement of what happened, but such a determination is unnecessary for purposes of this decision.

Shortly thereafter, Jackie Hurlbutt, a senior executive with First Chicago, flew to Seattle to meet with Curley and Barry Ackerley, the President and CEO of Ackerley. (Tr. at 85.) Over lunch Ms Hurlbutt attempted to persuade Ackerley to accept the late notice and continue payments under the Swap Agreement. (Tr. at 86.) Ackerley refused and this litigation followed.

Discussion

The Swap Agreement consisted of two documents: a 1987 version of the International Swap Dealers Association ("ISDA") [FN3] Interest Rate and Currency Exchange Agreement (the "1987 ISDA Master Agreement") and a confirmation providing specifics for this particular interest rate swap (the "Confirmation"). At the time the ISDA designed this Master Agreement, First Chicago was a major player in the industry group. The Confirmation was prepared solely by First Chicago. Both documents were signed by First Chicago and Ackerley. The 1987 ISDA Master Agreement did *not* provide for facsimile transmission as an acceptable means of notification between the parties. The contract between the parties specifically provided:

> FN3. ISDA, which now stands for International Swaps and Derivatives Association, Inc., is the global trade association representing leading participants in the privately negotiated derivatives industry. As part of its effort to identify and reduce the sources of risk in the derivatives

and risk management business, the ISDA developed a master agreement for interest rate and currency exchange swaps.

Any notice or communication in respect of this Agreement will be sufficiently given to a party if in writing and delivered in person, sent by certified or registered mail (airmail, if overseas) or the equivalent (with return receipt requested) or by overnight courier or given by telex (with answerback received) at the address or telex number specified....

There is absolutely no proof that First Chicago attempted notification of Ackerley by any of the means listed in the contract. Failure to give the required notice defeats First Chicago's entire claim. *See Kaplan v. Lippman*, 75 N.Y.2d 320, 324-25, 552 N.E .2d 151, 552 N.Y.S.2d 903 (1990)(stating that the optionee must exercise the option in accordance with its terms and in the manner specified in the option). It is hornbook law that when the terms of a written contract are clear and unambiguous and those terms require written notification in a particular manner then such notification can be given only in that manner. *See* 22 N.Y. Jur Contracts § 214; *see also* Farnsworth on Contracts § 3.23a (1998)("Because an option is a contract ... the time for exercise of the option is subject to the rules on conditions, including the rules relating to waiver of conditions."); *Cruden v. Bank of New York*, 957 F.2d 961, 976 (2d Cir.1992)("Under New York law, a written contract is to be interpreted so as to give effect to the intention of the parties as expressed in the unequivocal language they have employed.").

**\*5** First Chicago attempts to excuse its failure to give the requisite notice by arguing that its written contract with Ackerley had changed due to changes in industry practice. By June 20, 1994, a revised ISDA Master Agreement had been developed (the "1992 ISDA Master Agreement"). This version of the ISDA Master Agreement did provide for notification by facsimile in limited circumstances. First Chicago argues that by 1994 it was industry practice for derivatives market-makers to notify their clients of the decision to exercise an option by fax. (Tr. at 45.) Even under the provisions of the 1992 ISDA Master Agreement, First Chicago bears the burden of proving that such fax

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2001 WL 15693 (S.D.N.Y.)
**(Cite as: 2001 WL 15693 (S.D.N.Y.))**

Page 5

notification was effective and in this it has totally failed.

Section 10(a)(iii) of the 1992 ISDA Master Agreement provides that notice is effective:

> if sent by facsimile transmission, on the date that transmission is received by a responsible employee of the recipient in legible form (it being agreed that the burden of proving receipt will be on the sender and will not be met by a transmission report generated by the sender's facsimile machine).
>
> Notice by facsimile is not effective, however, to communicate (i) events of default and termination or (ii) early termination. (1992 ISDA Master Agreement § 10(a))

First Chicago is unable to satisfy this burden. The provision specifically states that this burden will not be satisfied by mere production of a facsimile transmittal report. [FN4] There is no convincing evidence that the events of June 20, 1994 transpired as portrayed by First Chicago. First Chicago attempted to satisfy its burden by producing a witness who testified that he "would have put the fax into the machine and pushed it through." (Tr. at 54.) This person, however, did little more than place the papers in the machine's feeder, hit "start," walk away, and retrieve the papers on the others side some time later. (Tr. at 64.) This witness, though not unbelievable, cannot attest to the proper sending of the fax in question.

> FN4. First Chicago is unable to produce even this insufficient piece of evidence, and alleges that the fax machine in question, located on the Global Derivatives floor in the First Chicago offices, is unable to produce such reports.

First Chicago also relies on the stipulated fact that there was a 1.1 minute connection between the First Chicago fax machine and the fax machine in Ackerley's Seattle headquarters. Although a connection between these two machines may have been made, there is no evidence that the fax was properly transmitted or what

that fax might have been. Accepting First Chicago's version of the story requires a finding that Robertson's testimony was false. No part of Robertson's testimony leads me to believe that she was untruthful.

Additionally, the sequence of events on June 22, 1994 does not support First Chicago's version of what happened on June 20, 1994. Accepting as true the fact that Curley received the fax prior to contacting Selle, [FN5] I find that First Chicago would have no reason to re-send the fax in question absent a belief that there was a problem with the earlier transmission. Under its second argument First Chicago has failed entirely to satisfy its burden of proof.

> FN5. In this regard, I find the straight forward testimony of Selle infinitely more believable than the hedged and cagey answers given by Lance as to the chronology of events on June 22, 1994.

\*6 Finally First Chicago fell back on the argument that the occasional late notification of the exercise of an option is always accepted. (Tr. at 178.) Even were this true, I will not set aside the explicit language of the Confirmation, calling for notice by June 20, 1994, in favor of suspect industry practices. *See Croce v. Kurnit,* 737 F.2d 229, 238 (2d Cir.1984) (stating that "evidence of industry practice may not be used to vary the terms of a contract that clearly sets forth the rights and obligations of the parties."); *In re Western Union Telegraph Co.,* 299 N.Y. 177, 184-85, 86 N.E.2d 162, 166 (1949) (same).

### Damages

While it may be unnecessary, in view of the foregoing, to discuss First Chicago's failure to prove damages, I do so for the sake of completeness. First Chicago does not claim a loss of profits; rather its claim to damages is based on the theoretical model of a swap agreement and the claim that First Chicago paid out to someone an amount equal to the other half of the swap. Of course at no time did First Chicago identify to whom such payment was made.

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2001 WL 15693 (S.D.N.Y.)
**(Cite as: 2001 WL 15693 (S.D.N.Y.))**

Page 6

On the issue of damages, I was disturbed by First Chicago's apparent withholding of relevant evidence in the face of Ackerley's document requests. During discovery Ackerley twice requested all information regarding the calculation of damages. (Tr. at 146.) In response, First Chicago prepared a simple two-column table indicating the dates and amounts for payments that would have been made by Ackerley to First Chicago had the Option been properly exercised. (Pl.'s Ex. 4.) These calculations do not set out the floating interest rate at the time of hypothetical payment. [FN6] Neither do they incorporate the fixed interest rate payments that First Chicago would have made on the complementary side of the hedge if there had been a complementary side to the swap. No other documents responsive to the requests were produced. Yet, Anderson, a trader on the interest rate derivatives trading desk at Bank One, [FN7] referred to an accounting document which indicated the loss taken by First Chicago on Ackerley's refusal to accept the Option. (Tr. at 160.) Although this document was in the possession of First Chicago's counsel, it was never turned over to Ackerley.

FN6. First Chicago apparently expected Ackerley to calculate the interest rate by "backing it out" or doing the research itself. This response exemplifies the unprofessionalism with which First Chicago's counsel approached this trial. It also misses the point completely. A discovery request calling for the calculation of damages requires more than merely setting forth the figure demanded, which is, in essence, what First Chicago produced. Fed.R.Civ.P. 26(a)(1)(C) provides that as part of initial disclosure, a party shall provide to other parties "a computation of any category of damages claimed by the disclosing party, making available for inspection and copying as under Rule 34 the documents or other evidentiary material, not privileged or protected from disclosure, on which such computation is based, including materials bearing on the nature and extent of injuries suffered...."

Plaintiff's Exhibit 4 does not satisfy this requirement.

FN7. Bank One is the survivor entity of the First Chicago merger with Bank One.

Ultimately, there is no conclusive evidence of any damages in this case. First Chicago's alleged damages expert, Anderson, was in reality no more than a fact witness, and more importantly, was wholly unbelievable. His insistence on speechifying from the witness stand rather than answering the questions asked discredited his testimony entirely.

Even the casual student of the law of contracts knows that the plaintiff's proof of damages in a breach of contract claim includes of necessity proof of mitigation of those damages either attempted or achieved by plaintiff. *See Wilmot v. New York,* 32 N.Y.2d 164, 168, 297 N.E.2d 90, 344 N.Y.S.2d 350 (1973) (stating that the party seeking damages is under a duty to make reasonable efforts to avoid consequences of the act complained of); *Middle East Banking Co. v. State Street Bank Int'l,* 821 F.2d 897, 902 (2d Cir.1987) ( "It is beyond dispute that New York requires injured parties to take reasonable steps to minimize damages."). Here there was not even an attempt to prove any mitigation of damages for the simple reason that there were no damages paid out by First Chicago. Nor was there any proof of lost profit advanced by Plaintiff.

Conclusion

*7 For all of the above reasons, I find that First Chicago has failed to prove its claim for breach of contract and hereby order that the Clerk of Court enter judgment in favor of Ackerley and close this case.

SO ORDERED.

2001 WL 15693 (S.D.N.Y.)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.